PER CURIAM.
This cause is before us on appeal from a final order of the Department of Health and Rehabilitative Services (HRS), denying certificates of need (CONs) for nursing home beds in Lee County. Appellants Hill-haven and Maple Leaf/Health Care and Retirement Corporation of America, Inc. were among a number of applicants filing in the July 1986 batching cycle in response to an HRS statement of need for 205 beds in Lee County. The administrative review process below was marred by a number of unusual circumstances, resulting in delay and confusion even beyond that usual in these cases.[1]
*1239 During the period following the filing of the application, HRS revised its determination of bed need, dropping from the original 205, at the time of the application, to 56, and then, by the time of hearing, settling on 92 as the number of beds needed in Lee County. Appellants disputed the bed count and proceeded to hearing on their respective applications for 120 beds.
The hearing officer found that Hillhaven was the superior applicant and recommended Hillhaven be granted a CON for a 120-bed facility, holding, in part, as follows:
As between the competing applicants, consideration of those criteria demonstrates that Hillhaven is the superior applicant whether it is evaluated on its application as initially reviewed by the Department or as updated at hearing. Among other things, the Hillhaven facility is spacious with large and well appointed patient rooms, its project costs are most reasonable (whether type 5 or type 4 construction), its programmatic proposal and staffing levels are most reasonable in light of existing demand, its provision for Medicaid services is the highest, and its patient charges are the lowest.
HRS, however, rejected the hearing officer’s recommendation and, in the final order, denied all applications, ruling that there was a need for only 92 beds. HRS did not reject the findings regarding Hillha-ven’s qualifications but ruled that its application was based on 120 beds and therefore should not have been granted.
Appellants challenge HRS’s count of approved nursing home beds in Lee County, a number critical in the bed-need calculation. By HRS’s count, only 92 beds are available to be awarded in Lee County. HRS’s computation is based on there being 150 approved beds on the date the “State Agency Action Report” (SAAR) was signed. Appellants contend the approved bed count should be made on the date of their applications, the same date on which licensed beds are counted. On the date of application, there were zero approved beds in Lee County.
All parties agree that former Florida Administrative Code Rule 10-5.11(21)(b)9 (1986), applies. This rule provides in part as follows:
The net bed allocation for a subdistrict, which is the number of beds available, is determined by subtracting the total number of licensed and 90% of the approved beds within the relevant departmental subdistrict from the bed allocation determined under subparagraphs 1 through 9 [sic 8]....
HRS’s position is that because the rule does not specify a date for the bed count, it may select a date by way of rule interpretation. Appellants contend that HRS has failed to set forth any basis for the date chosen and has offered no explanation for counting approved beds on a date different from the date licensed beds are counted.
HRS contends that the bed count on the SAAR date is more current than the application date. The fact is, however, that the 150 beds HRS counts on the SAAR date were reduced prior to hearing to 120.[2] On either the application date or the hearing date, the number of approved beds in Lee County would allow granting a CON for 120 beds. Only the interim SAAR date chosen by HRS would preclude granting a CON for 120 beds.
The hearing officer found no basis for HRS’s selection of the SAAR signing date; nor do we. We also reject the contention that counting approved and licensed beds on different dates is a fair interpretation of the rule. On the contrary, the rule quite clearly expresses only one distinction to be *1240 made in counting approved, as opposed to licensed, beds, to-wit: that 90 percent, rather than 100 percent, of approved beds be counted.
In Meridian, Inc. v. Department of Health and Rehabilitative Services, 548 So.2d 1169 (Fla. 1st DCA 1989), this court accepted HRS’s argument that it was entitled to require use of statistics available at the time of application rather than the more current figures available prior to hearing. Meridian involved the population projection subsection of the same rule here in question. There, as here, the pertinent subsection specified no date for data used to calculate bed need. The Meridian opinion is, in pertinent part, as follows (548 So.2d at 1170-1171):
Appellants contended that the ,most recent population data from the ¡office of the Governor should be used ⅛ calculating the bed need. HRS contended that the population data available at the time the CON applications were required to be filed should be used to determine the numerical bed need in the fixed pool for that batching cycle. ...
[[Image here]]
... We conclude that the construction given rule 10-5.011(l)(k)2.h by HRS is neither arbitrary nor capricious, but is completely in accord with the purposes of the act and the principles of comparative review espoused in Gulf Court. The logic of HRS’s position is unassailable. It gives effect to the notion that, pursuant to applicable principles of comparative review, the number of beds in the fixed pool in the July 1985 planning cycle (July 1988) to which the applicants’ applications were addressed (as shown by the formula) would become set at July 1985 for purposes of comparative review, even though new data coming to light in later months or years might reflect a different bed need when factored into the formula. If the number of beds in the fixed pool could be altered by new information developed after the initial applications were fijed, there would be no basis for ever fixing the number in the pool, and the evils in the system addressed in Gulf Court would be perpetuated, [emphasis added]
Meridian, and the authorities cited in that decision, support the conclusion that data available at the time of application should be used to determine bed need.[3]
Appellants raise a number of other issues. Of these, only Maple Leaf’s contention regarding the proposed Alzheimer’s unit need be considered. Both appellants proposed facilities providing services for Alzheimer’s patients. The hearing officer found that Hillhaven’s approach to the need for such services was superior, and these findings were not rejected by HRS. Although HCR makes a compelling argument that there should be a separate Alzheimer’s unit, we must uphold that portion of the decision below in deference to agency expertise and in the absence of clear evidence to the contrary.[4]
Accordingly, the order below is affirmed in part and reversed in part, and the cause is remanded for the granting of Hillhaven’s application in accordance herewith.
BOOTH and WIGGINTON, JJ., concur.
BARFIELD, J., dissents with written opinion.

. There is no indication that these appellants were responsible for the unusual circumstances, *1239 which included three administrative reviews of the applications and the resignation of the original hearing officer after the 12-day hearing, but before the recommended order could be entered.

. This was the result of settlement of a long-pending case, Gulf Court Nursing Center v. Department of Health and Rehabilitative Services, 483 So.2d 700 (Fla. 1st DCA 1986), affecting Lee County. On the SAAR date, there were 150 approved beds due to Gulf Court Nursing Center case, supra, but that number was reduced to 120 by settlement prior to the hearing below in this case.

. In the alternative, appellants argue that the settlement of the Gulf Court case, and its impact on bed need in Lee County, is an exceptional circumstance also supporting a CON for 120 beds. Because of our ruling herein, it is unnecessary to address that issue.

. The hearing officer’s findings are in part as follows:
While there is a demand for Alzheimer's disease care, and the preferred mode of care is in a separate unit specifically designed, staffed, and equipped to deal with this degenerative disease, there was no persuasive proof that the demand is such as to warrant the creation of a separate unit such as proposed by HCR and Careage. Absent such quantifiable demand, the application of Hillhaven more realistically addresses the need for Alzheimer's disease patients....